UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATAGON MANAGEMENT LLC, *Plaintiff*,<br><br>vs.<br><br>THE ARAGON ASSOCIATION, THE ARAGON SHIELD FOUNDATION, ARAGON X AG, AND LUIS CUENDE, *Defendants*. | Case No. ______________________<br><br>**COMPLAINT** |

Patagon Management LLC, by its undersigned counsel, alleges as follows, based on knowledge as to its own acts and on information and belief as to all others:

## INTRODUCTION

1. The Aragon Association (the "Association") raised over $25 million in the sale of a cryptocurrency token—the Aragon Network Token ("ANT")—in part by representing that 70% of these funds would belong to ANT holders and be placed in a treasury (the "Treasury") that the Association would take custody of and manage for a short period before returning the funds to ANT holders. Those funds would be returned to ANT holders via a decentralized autonomous organization separate and distinct from the Association that the Association promised would be composed of and governed by ANT holders alone (the "DAO"). Despite the lofty rhetoric in its representations to ANT purchasers and in its "Manifesto,"[1] the Association never fulfilled its promises of decentralized governance by the ANT holders, and instead used its position of trust, influence, and control over ANT holders to attempt to shape the DAO into an entity through which the Association and its officers could direct ANT holders' funds to their personal business

[1] *See* Aragon, *Aragon Manifesto*, ARAGON.ORG, https://aragon.org/manifesto (last visited Oct. 30, 2024).

ventures. As the scheme began to unravel, and after failing to transfer Treasury funds to the DAO as promised, the Association and its officers made the brazen decision to abandon ANT holders and the DAO and decide for themselves how ANT holders' funds in the Treasury—now valued in the hundreds of millions of dollars—would be used.

2. Despite repeatedly acknowledging their legal duties to ANT holders as the custodian and manager of their funds, the Association and its officers chose to present ANT holders with a take-it-or-leave-it option: hand over their ANT via a smart contract created by the Association in exchange for a limited amount of Ether which reflected *only part* of the Treasury's total assets (the "Redemption Smart Contract").[2] This strong-arm "offer" would only be valid for one year, ending on November 2, 2024, after which the redeemed ANT would be destroyed.

3. As for the other assets in the Treasury not bound up in the Redemption Smart Contract, valuing at least *millions of dollars*, the Association and its officers announced, in a blatant and dictatorial act of theft, that it would keep those funds for itself to (i) pay for the legal costs to defend their unlawful actions and (ii) fund the new ventures of the Association's officers. The Association's theft would also extend to any portion of the funds set-aside in the Redemption Smart Contract which remained unclaimed after its own imposed November 2nd deadline. These unclaimed funds, also rightfully belonging to ANT holders and not the Association or its officers, will likely amount to *tens of millions more dollars*. This final act is merely the culmination of a years-long pattern of self-dealing and deception by the Association and its officers.

4. While this case involves complex and novel technology—blockchains, smart contracts, DAOs—at its core is a simple and conventional story of broken contractual promises, deceit, and self-dealing. The Association as well as its co-founder Luis Cuende enticed ANT

[2] Aragon, *A New Chapter for the Aragon Project*, ARAGON BLOG (Nov. 2, 2023), https://blog.aragon.org/a-new-chapter-for-the-aragon-project/.

holders, including Patagon, to purchase ANT—thus enriching themselves and other insiders in the process to the tune of millions of dollars—through the promise that the Association would take custody of and manage the Treasury responsibly until those funds could be turned over to the DAO and thereafter managed directly by the ANT holders. Yet, following the DAO's formation and request for the Association to hand over control of the Treasury, the Association changed its mind, reneged, and now refuses to turn over the Treasury funds to their rightful owners—ANT holders. Patagon asks this Court to hold the Association and its officers accountable in an important reminder that the blockchain is not a barricade behind which bad actors can avoid the law's reach.

5. As such, Patagon brings claims for (1) breach of contract, (2) breach of fiduciary duty; (3) conversion; (4) unjust enrichment, (5) money had and received; (6) constructive trust; and (7) equitable accounting. Patagon seeks compensatory and equitable relief, including a restraining order and subsequent injunctions to enjoin the Defendants from absconding with or otherwise moving Treasury assets until the conclusion of this matter, together with pre- and post-judgment interest, fees, and costs of suit as well as any other relief the Court deems just and proper.

## PARTIES

6. Patagon Management LLC ("Plaintiff") is a Delaware limited liability company with one member who is a citizen of the state of California. Patagon's principal address is 379 W. Broadway, New York, NY 10012, where its employee works. Patagon purchased ANT in New York.

7. The Aragon Association (the "Association") is a non-profit entity headquartered in Bahnhofstrasse 20, Zug, Switzerland. Prior to the initiation of this lawsuit, counsel for Plaintiff

sent a demand letter to the Association and it responded through counsel. While counsel for the Association has not agreed to accept service of process, it does provide a means of ensuring that the Association receives notice of Plaintiff's request for a Temporary Restraining Order and the Court's order.

8. The Aragon Shield Foundation ("Aragon Shield") is a non-profit entity headquartered in Bahnhofstrasse 20, Zug, Switzerland. Prior to the initiation of this lawsuit, counsel for Plaintiff sent a demand letter to Aragon Shield and it responded through counsel. While counsel for Aragon Shield has not agreed to accept service of process, it does provide a means of ensuring that Aragon Shield receives notice of Plaintiff's request for a Temporary Restraining Order.

9. Upon information and belief, Aragon X AG ("Aragon X") is a limited company headquartered in Bahnhofstrasse 20, Zug, Switzerland. Aragon X was previously known as Eagle Ops AG.

10. Defendant Luis Cuende ("Cuende") is a Spanish citizen who upon information and belief currently resides in Portugal. He is the co-founder and a member of the governing committee of the Association.

## JURISDICTION AND VENUE

11. The Court has diversity jurisdiction under 28 U.S.C. 1332 because this dispute is between citizens of a State and citizens or subjects of one or more foreign states, and the amount in controversy exceeds $75,000.

12. The Court has personal jurisdiction over the Association. The Association participated in the marketing and sale of ANT to the global public, including to individuals and companies that are citizens of New York. For example, the Association's website contains a list

of participants in the ANT pre-sale which include CoinFund Management LLC, a company with members who have New York addresses.[3] The Association elsewhere identifies Placeholder Management, LLC, another company with New York-based members, as an ANT holder.[4] The Association's public sale of ANT on its website, which demonstrably involved transactions with New York entities, demonstrates its deliberate engagement with the State of New York. The Association's website is highly interactive, and includes directions and tools for DAO developers, links to public chat rooms managed by the Association, as well as a link for connecting an Ethereum wallet for purposes of redeeming ANT. The Association's actions were directed at, and had the intended effect of, reaching New York citizens and ultimately causing injury to persons residing in, located in, or doing business throughout the United States, including in the Southern District of New York.

13. The Court has personal jurisdiction over Aragon Shield. Aragon Shield, which has the same address as the Association, was established by the Association and its officers to further its scheme to steal ANT holders' funds in the Treasury. Aragon Shield's very purpose includes protecting the Association and its officers from legal liability, including this lawsuit, using funds it took from the Treasury. As a result, Aragon Shield is a knowing participant in the theft of ANT holders' funds, which holders have included New York citizens.

14. The Court has personal jurisdiction over Aragon X. Upon information and belief, Aragon X, which has the same address as the Association and Aragon Shield, is the present or future recipient of funds stolen from ANT holders by the Association and its officers. Aragon X

---

[3] Aragon, *Pre-Sale Transparency Report*, ARAGON BLOG (Aug. 5, 2020), https://blog.aragon.org/pre-sale-transparency-report-333e310304c/; CoinFund Profile, CRUNCHBASE, https://www.crunchbase.com/organization/coinfund (last visited Oct. 30, 2024).

[4] Aragon, *Who holds ANT?*, ARAGON LEGACY DOCS (last updated May 11, 2023), https://legacy-docs.aragon.org/faq/ant-token/who-holds-ant; Placeholder Profile, CRUNCHBASE, https://www.crunchbase.com/organization/placeholder-55ca (last visited Oct. 30, 2024).

was established in 2023 as part of the Association's scheme to abscond with Treasury funds belonging to ANT holders, including Plaintiff. As a result, Aragon Shield is a knowing participant in the theft of ANT holders' funds, which holders have included New York citizens.

15. The Court has personal jurisdiction over Cuende. Cuende is a co-founder of the Association and member of its leadership team, as well as the co-creator of ANT. In his role, Cuende directed and controlled the marketing and sale of ANT, including to New York citizens. Cuende also used his position in the Association and position of influence and control over ANT holders to engage in self-dealing transfers of funds from the Treasury to his unrelated business ventures.

16. Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants are deemed to reside in any judicial district in which they are subject to the Court's personal jurisdiction. In addition, Defendants' conduct against Plaintiff has occurred, in part, within the state of New York as the harmful effects of Defendants' conduct were suffered within the state of New York.

## FACTUAL ALLEGATIONS

### A. The Association promotes itself as a transparent organization that supports the building of self-governing DAOs.

17. The Association promoted itself as the legal steward of the Aragon project with responsibility for taking custody of and managing certain funds, including those raised through the sale of ANT.

18. The Association was founded in November 2016 by Luis Cuende and Jorge Izquierdo ("Izquierdo").[5] Since its inception, the Association has touted itself and its founders as

[5] Aragon, *About Aragon*, ARAGON.ORG, https://aragon.org/about-aragon (last visited Oct. 30, 2024).

upholding lofty standards and principles regarding decentralized governance. The Association also prides itself on being founded by Cuende and Izquierdo to address "emergent societal crises and failures of democracy."[6]

19. In April 2017, Cuende and Izquierdo published a whitepaper for the "Aragon Network," described as "the first decentralized autonomous organization whose goal is to act as a digital jurisdiction that makes it extremely easy and friendly for organizations, entrepreneurs and investors to operate"—akin to a "far more efficient Delaware that lives in the blockchain."[7] According to the whitepaper, the DAO would allow anyone to create token-governed organizations on the Ethereum blockchain. These "Aragon organizations," which included "companies, open source projects, NGOs, foundations, [and] hedge funds" could be "easily customized."[8] Ownership of Aragon organizations would be "transparent and transferable" through transactions of governance tokens on the Ethereum blockchain, and these organizations could raise capital via "direct sales and public offerings" of shares in the form of governance tokens.[9] ANT, as the governance token of the DAO itself, would "represent[] the wealth of the decentralized Aragon-enabled economy,"[10] and "governance decisions will be made by ANT holders with a system of proposals and votings."[11]

20. In 2018, the Association published the Aragon Manifesto further elaborating on its lofty principles. According to the Manifesto:

> "Aragon is a fight for freedom. Aragon empowers freedom by creating liberating tools that leverage decentralized technologies..... For the first time in history, thanks to

---

[6] Aragon, *About Aragon*, ARAGON.ORG, https://aragon.org/about-aragon (last visited Oct. 30, 2024).
[7] Luis Cuende & Jorge Izquierdo, *Aragon Network: A Decentralized Infrastructure for Value Exchange* (Apr. 20, 2017), Section 4, available at https://academy.bit2me.com/wp-content/uploads/2021/05/aragon-whitepaper.pdf.
[8] Cuende & Izquierdo (2017) Section 1.1.
[9] Cuende & Izquierdo (2017) Section 2.2.F-G.
[10] Cuende & Izquierdo (2017) Section 5.1.
[11] Cuende & Izquierdo (2017) Section 5.3.

> blockchain technology and smart contracts, we can now create fully decentralized organizations, which are truly autonomous and unstoppable. Decentralized organizations change our relationship with governance: from something that is imposed upon us by others, into something we choose to opt into. Where we are equally serving and served, rather than just serving.… In today's world, our governing power over society's common goods is negligible. Even for exercising small changes over your environment (your city, state or corporation), you might have to go through cumbersome and opaque bureaucratic processes. This happens because the coordination costs were high in the old world. But now, thanks to the Internet and decentralized governance, we can, and must, engineer systems to empower the people's voice to their fullest potential."

https://blog.aragon.org/the-aragon-manifesto-4a21212eac03/

**B. The Association and its founders raise $25 million through the sale of the Aragon Network Token to the public, promising to grant purchasers ownership of 70% of the funds raised and the right to govern a DAO composed of token holders.**

21. In 2017, the Association, under the control of its founders, raised $25 million of operating capital through an Initial Coin Offering, which consisted of a pre-sale of ANT to three institutional and three individual investors[12] followed by a public sale of ANT.[13] The Association published "sale terms" for its ANT public offering.[14] These terms established a 70/15/15 distribution of the funds raised in the sale: 70% of funds would belong to ANT purchasers (these funds comprising the Treasury), 15% would go to the Association itself, and 15% would go to the Association's "founders and early contributors."[15]

22. The sale raised 275,000 Ether, valued at roughly $25 million at the time, which under the sale terms granted assets valued at $17.5 million to ANT holders and roughly $3.75 million each to the Association itself and the Association's "founders and early contributors."[16]

[12] Aragon, *Pre-Sale Transparency Report*, ARAGON BLOG (Aug. 5, 2020), https://blog.aragon.org/pre-sale-transparency-report-333e310304c/

[13] Aragon, *Historical token sale*, ARAGON LEGACY DOCS (last updated May 11, 2023), https://legacy-docs.aragon.org/the-ant-token/about-the-token/historical-token-sale-information

[14] Aragon, *Aragon Network Token sale terms*, ARAGON BLOG (Aug. 5, 2020), https://blog.aragon.org/aragon-network-token-sale-terms-8998f63a3429/

[15] Aragon, *Aragon Network Token sale terms* (Aug. 5, 2020).

[16] Aragon, *Historical token sale*, ARAGON LEGACY DOCS (last updated May 11, 2023).

The Association's website confirmed the breakdown post-sale by stating that ANT holders received a "grant" consisting of 70% of these funds.[17] In its post celebrating the sale, the Association stated: "We are extremely humbled by the trust the community placed in our project. We don't take that trust lightly…"[18]

23. In its announcement of the sale, the Association and its officers explained that by holding ANT, ANT holders had a governance interest in the DAO. The Association stated that ANT would be the "built-in governance system" of the Aragon Network and promised that "ANT holders will be able to decide every aspect of [the DAO's] functioning."[19] In addition to ownership rights in the Treasury, the Association represented that ANT holders could purchase ANT with the expectation of profit due to the increased value of ANT over time as the Aragon Network expanded: "[b]y holding ANT you can benefit from any potential increase in the value of the Aragon Network and its related services."[20] Accordingly, since the initial sale of ANT, market participants have acquired ANT with the understanding and expectation that the ANT they acquired could increase in value over time as the Aragon Network grew and conferred on them both (i) governance rights in the DAO that would eventually directly control the Treasury, and (ii) ownership rights in the Treasury, so that they would benefit from any increase in the value of the Treasury's assets.

---

[17] Aragon, *Historical token sale*, ARAGON LEGACY DOCS (last updated May 11, 2023).
[18] Aragon, *The Aragon Token Sale: The Numbers*, ARAGON BLOG (Aug. 5, 2020), https://blog.aragon.org/the-aragon-token-sale-the-numbers-12d03c8b97d3/
[19] Aragon, *Announcing the Aragon Network Token sale*, ARAGON BLOG (Aug. 5, 2020), https://blog.aragon.org/announcing-the-aragon-network-token-sale-fe83fe36902c/; *see also* Aragon, *What can I do with ANT?*, ARAGON LEGACY DOCS (last updated May 11, 2023), https://legacy-docs.aragon.org/faq/ant-token/what-can-i-do-with-ant ("ANT is primarily used for the governance of the Aragon Network. You can use ANT for voting on the proposals and participating in Aragon governance.").
[20] Aragon, *Long-term holding ANT - What benefits?* ARAGON LEGACY DOCS (last updated May 11, 2023), https://legacy-docs.aragon.org/faq/ant-token/do-i-get-any-additional-benefits-for-holding-ant-over-the-long-term

24. The founders then also represented that the Association and its officers would act as the custodian and manager of ANT holders' funds in the Treasury for an interim period until the DAO, composed of ANT holders, was capable of managing the Treasury directly. The Association's website confirmed that it "is the legal steward of the Aragon project and is responsible for managing the funds raised in the Aragon Network Token sale."[21] The Association represented that "[i]n terms of treasury allocation among different assets, [the Association] looks for highly liquid assets that resonate with the vision of decentralization and DAOs" and promised to release "Transparency Reports" bi-annually that "will show the state of the Treasury and the spending along with the news from the previous 6-months."[22]

25. The Association and its officers then further represented that the rights afforded to ANT holders were freely transferrable and assignable through secondary sales of ANT—an essential element to the project that would allow for membership in the DAO to evolve over time and to incentivize ANT purchasers through the prospect of selling their ANT at a profit. Following the sale and consistent with this promise, the Association's website advertised that ANT could be "obtained across a variety of exchanges, on-chain and off-chain," and included a link to a list of all the exchanges where ANT could be purchased.[23]

### C. The Association uses its influence and control over ANT holders to persuade them to approve a charter for the DAO.

26. In September 2021, ANT holders voted to approve the Aragon Network Charter ("Charter"), intended to be the governing document of the DAO and purporting to establish the

---

[21] ARAGON ASSOCIATION (last visited Oct. 29, 2024), https://aragon.org/aragon-association
[22] ARAGON ASSOCIATION (last visited Oct. 29, 2024).
[23] Aragon, *About ANT*, ARAGON LEGACY DOCS (last updated May 11, 2023), https://legacy-docs.aragon.org/the-ant-token/about-the-token/about-ant

rights and obligations of ANT holders as DAO members.[24] The first draft of the Charter was crafted by the Association's officers and later shared by Daniel Ospina ("Ospina"), the Association's then-"Head of Governance,"[25] to the Association's online forums.[26] In his post, Ospina stated that after soliciting feedback from ANT holders, the Association would "submit to the legal team to add their feedback too (and so community feedback after this point might have to wait until the DAO is launched and be submitted as a proposal)."[27] Upon information and belief, this "legal team" represented only the Association, not ANT holders.

27. Though the Association had a duty to act in the interests of ANT holders given the position of trust and confidence it held, the final Aragon Network Charter revealed the Association's primary concern was shielding itself from legal liability and maintaining control over ANT holders' funds. The Charter claimed that "[t]his Charter and the Aragon Network are fully independent and not controlled by the Aragon Association," followed by a broad release of liability for the Association.[28] Despite this claim of full independence, the Charter also established that the Association would appoint a controlling majority of each of the DAO's governing bodies, with members of those bodies to be paid monthly fees by the DAO, caveated with the promise that governance would be gradually returned to ANT holders over the course of several years.[29]

---

[24] *Aragon Network DAO Charter*. Retrieved from https://web.archive.org/web/20230628234623/https://ipfs.eth.aragon.network/ipfs/QmV3pQWAqq8Un71SU1RRDVqwAGy7bBQUPaqLkqHwb9H3w7 (last visited Oct. 30, 2024).

[25] Aragon, *Welcoming Daniel Ospina as Head of Governance at the Aragon Association*, ARAGON BLOG (Jul. 1, 2021), https://blog.aragon.org/welcoming-daniel-ospina-as-head-of-governance-at-the-aragon-association/

[26] Post by daniel-ospina, *An Aragon Network DAO Experiment and Aragon Network Charter*, ARAGON FORUM (Aug. 16, 2021), https://forum.aragon.org/t/an-aragon-network-dao-experiment-and-aragon-network-charter/2907

[27] Post by daniel-ospina, *An Aragon Network DAO Experiment and Aragon Network Charter* (Aug. 16, 2021).

[28] *Aragon Network DAO Charter*.

[29] *Aragon Network DAO Charter* at pp. 24-27.

And following the vote in favor of the Charter, the Association retained control over the Treasury rightfully owned by ANT holders.

28. The strategy of the Association and its officers was clear: use their control and influence over the DAO to effectuate the approval of the Charter, offload the Treasury to the DAO, grant the Association's officers a controlling majority of the DAO's governing bodies, and then use the DAO as a "stateless" organization through which the Association's officers could control and deploy the Treasury to their own ends. In its own words, through the passing of the Charter, "Aragon has started the process of shedding its corporate structure and transforming into a fully decentralized organization, owned and managed by $ANT holders…."[30] The Association described the DAO "not as a legal entity but a decentralized, autonomous coordination mechanism for sovereign individuals to collaborate on shared goals."[31] The Association essentially sought to set up its own digital nation, with "legislative," "judicial," and "executive" branches under the full control of the Association's officers as the DAO's digital oligarchs.

**D. Frustrated with ANT holders' failure to comply with its scheme, the Association reneges on its promise to return Treasury funds to ANT holders.**

29. As represented during the initial ANT sale, the Association and its founders promised that the Association would turn over control of the Treasury to the DAO. But the Association's attention was actually focused on maintaining control over the riches in the Treasury for itself and its officers—particularly given that the value of the Treasury's assets had ballooned since the initial ANT sale in 2017 to *nearly $200 million* at the time the Charter was passed due to the rise in cryptocurrency prices. Following the Charter's passing, the Association

---

[30] Aragon, *AN DAO Launch*, ARAGON BLOG (Oct. 28, 2021), https://blog.aragon.org/an-dao-launch/

[31] Aragon, *AN DAO Launch* (Oct. 28, 2021).

continued to custody and manage the Treasury, despite its initial promises to act as only a "steward" of funds until the DAO's digital infrastructure was up and running.

30. In June 2022, ANT holders voted to move the Treasury to the DAO, as the Association and its founders had promised to do since the ANT sale. The Association acknowledged the validity of this vote on its website, confirming that "[s]ince 2017, the treasury has been held and managed by the Aragon committee members, who make up the board of the nonprofit Aragon Association."[32] However, consistent with the Association's scheme from the beginning, it wanted to transform itself into a DAO, allowing the Association's officers to acquire complete control over the Treasury without needing to bother with the legal limitations of its non-profit structure. The Association's statements at the time aligned with this plan, explaining that "Aragon was always meant to become a DAO."[33] However, faced with a direct vote by ANT holders to return the Treasury, the Association bought itself time under the guise of protecting "the security of the treasury" and announced a "soft deadline" for returning the funds of November 30, 2022, ensuring ANT holders that its "goal is to meet the deadline and expectations of ANT Holders."[34]

31. Instead, behind the scenes the Association's officers plotted ways to get away with their original scheme to transfer the Treasury out of Aragon's non-profit form to new entities that they controlled, all the while maintaining their public appearance as the trusted guardian of ANT holders' funds. After its November 30th deadline passed without the return of the Treasury funds, the Association announced a "new governance approach" for the DAO under which the

---

[32] Aragon, *The Future of Aragon: Treasury to Transfer into a Delegated Voting DAO*, ARAGON BLOG (Jul. 19, 2022), https://blog.aragon.org/the-future-of-aragon-treasury-slated-to-move-into-the-hands-of-ant-token-holders/

[33] Aragon, *The Future of Aragon: Treasury to Transfer into a Delegated Voting DAO* (Jul. 19, 2022).

[34] Aragon, *The Future of Aragon: Treasury to Transfer into a Delegated Voting DAO* (Jul. 19, 2022).

Association and its officers would "not transfer our entire treasury to [the DAO] at once" and instead would move funds "gradually" while "security of our governance is tested, additional vaults are deployed, and economic incentives between ANT and the Aragon treasury align."[35] This approach was not approved by ANT holders.

32. The Association's announcement also unilaterally altered the mechanism by which ANT holders used their ANT to govern the DAO. The Association told ANT holders that they would need to "wrap"[36] their ANT and use that wrapped ANT ("wANT") to cast votes.[37] This change was also not approved by ANT holders.

33. Next, in January 2023, the Association and its officers set up a new non-profit entity—the Aragon Ecosystem Association ("AEA")—as a "legal wrapper" for the DAO, in a post hoc attempt to rewrite their agreement with ANT holders and place new restrictions on the transfer of ANT holders' funds to the benefit of the Association and its officers.[38] The AEA's articles of association stated that any holder of wANT was a member of the AEA and listed the DAO as a body of the AEA. The stated purpose of the AEA was "to directly or indirectly further the growth and development of Web3 open-source software applications and tools for the easy, transparent, borderless, permissionless and secure establishment, administration and operation of decentralized organizations and ecosystems (the 'Aragon Project')."[39] The Association also drafted a one-sided "Participation Agreement" which by its terms applied to any legal holder of

---

[35] Aragon, *Launching the Aragon DAO*, ARAGON BLOG (Dec. 22, 2022), https://blog.aragon.org/launching-the-aragon-dao/

[36] "Wrapped" tokens are tokenized representations of an amount of another crypto token which can be used to perform actions on another blockchain.

[37] Aragon, *Launching the Aragon DAO* (Dec. 22, 2022).

[38] Aragon Ecosystem Association, *Articles of Association* (Jan. 31, 2023), available at https://bafybeiarvpgmhgcckqeqxxironqwagmjxrpbs3nxfgys65d3pwnug65nxm.ipfs.nftstorage.link/AragonEcosystemAssociationarticlesPublicversi.html

[39] Aragon Ecosystem Association, *Articles of Association* (Jan. 31, 2023).

wANT.[40] The Participation Agreement purported to alter the terms of the sale of ANT by forcing members to join the AEA through their use of wANT or else give up the voting rights afforded to them as ANT holders. The creation of the AEA, its articles of association, and the Participation Agreement were all *not* approved by ANT holders.

34. Satisfied in the security of the artifice it had created, the Association then reneged on the promise it and its founders made to ANT holders, announcing in May 2023 that—following a purported "attack" on the DAO—the Association would "only continue transferring funds to the Aragon DAO, if it has reasonable assurance the funds will go into the hands of builders advancing its mission, as per its mandate," advancing a false narrative that the Association and the DAO (and their finances) were somehow one and the same.[41] Revealing another motivation for the Association's charade, the Association explained that ANT had been qualified as a "utility token" under guidance from Swiss financial authorities published in February 2018 (after the initial ANT sale in 2017), meaning that the token must serve a particular purpose, which purpose was stated to be "to advance and protect Aragon's stated mission"—***not*** the interests of ANT holders. Despite the consistent communications of the Association and its founders enticing the public to purchase ANT with the expectation of profit, the Association now stated that ANT could not be used to "achieve profit-making ends."[42] In a clear acknowledgment of the obvious conflicts of interest present, the Association identified risks to the safe governance of the DAO as including "the legal risks to the utility classification of ANT, the violation of Swiss association law, as well as the

[40] Aragon Ecosystem Association, *Aragon DAO – Participation Agreement* (eff. Feb. 8, 2023), https://bafybeidgxjx5v3cka5uhz3k7hqx43xprtjxlpccbn3ud2jixalqvz52hla.ipfs.nftstorage.link/AragonDAOpaprticipationagreementpublicversion.html

[41] Aragon, *Aragon Association Takes Action to Safeguard the Mission of the Aragon Project and its Community of Builders*, ARAGON BLOG (May 9, 2023), https://blog.aragon.org/aragon-repurposes-dao-to-ensure-treasury-serves-its-mission/

[42] Aragon, *Aragon Association Takes Action to Safeguard the Mission of the Aragon Project and its Community of Builders* (May 9, 2023).

legal stewardship obligations of the Aragon Association to the treasury"—which were all risks created as a result of the Association's misdeeds.[43]

35. After overwhelming backlash from ANT holders, the Association publicly apologized and walked back its statements in a string of messages from its X (formerly Twitter) account.[44] The Association reassured ANT holders by reiterating its commitments to its contractual obligations and its duties as steward of the Treasury. The Association once again described itself as an entity "safeguarding the Aragon treasury and core infrastructure" and reiterated that the Association "has no control over" the DAO which was "governed by ANT holders." The Association even went as far as to confirm that "[t]he treasury is currently controlled by the [Association], who serves as its custodian" and that the Association "[was] transferring the treasury and core infrastructure to the DAO gradually to mitigate risk[.]"

36. Following these statements, in June 2023, Patagon purchased more than 700,000 ANT (representing roughly 1.7% of circulating ANT supply) on a secondary exchange with the expectation and intention of using its purchased ANT to participate in DAO governance while also benefitting from the potential increase in ANT's value (consistent with the Association's public statements) and the Association's continued promises to return the Treasury to the DAO. Cuende, the Association's co-founder and managing committee member, personally reassured Patagon prior to its purchase that the Association's intention was to revert funds to the DAO.

---

[43] Aragon, *Aragon Association Takes Action to Safeguard the Mission of the Aragon Project and its Community of Builders* (May 9, 2023).

[44] Aragon (@AragonProject), X (May 11, 2023), https://x.com/AragonProject/status/1656742212162539520

**E. After growing even more frustrated with the failure of their scheme as well as their mounting legal exposure, the Association and its officers unilaterally announce the dissolution of the DAO while offering only a partial redemption of ANT to ANT holders, absconding with the remaining Treasury assets worth millions of dollars.**

37. Despite the Association's public apology and recommitment to honoring its obligations and duties to ANT holders, months passed without further movement to return Treasury funds. Finally, in November of 2023, the Association announced that it would be dissolving both itself and the DAO. As part of its announcement, the Association explained that it would be offering a redemption that would allow ANT holders to redeem their tokens for Ether (ETH) that would come from the Treasury. At first glance, this seemed to be a fair decision which would allow the DAO to wind down while distributing its property to ANT holders consistent with their *pro rata* ownership rights.

38. But this "offer" came with strings attached. The redemption, which would be executed via a smart contract created by the Association (the "Redemption Smart Contract"), would only be funded with a ***portion*** of ANT holders' assets in the Treasury, which the Association stated would amount to only 87% of the Treasury's non-ANT holdings.[45] The redemption would only be valid for one year, ending on November 2, 2024 (the "Redemption Period"), and came with a set of terms and conditions that included a broad waiver of liability for the Association, its officers, and any other related individual or entity.[46] These terms and conditions, which were not approved by ANT holders or otherwise consented to by them, made clear to ANT holders that its intended purpose "is to eliminate the supply of ANT" and threatened that following the expiration of the redemption "ANT will no longer (a) be supported by the

[45] Aragon, *A New Chapter for the Aragon Project*, ARAGON BLOG (Nov. 2, 2023), https://blog.aragon.org/a-new-chapter-for-the-aragon-project/

[46] ANT Token Redemption Initiative, *Terms and Conditions*, ANT REDEMPTION PORTAL (last updated Oct. 12, 2023), https://ant.aragon.org/#/terms

Aragon Association or any of its successor organizations or communities, and (b) have any utility or purpose in the Aragon ecosystem."[47] The Association also confirmed that following its November 2nd deadline, all the ANT it had successfully coerced from ANT holders would be destroyed.[48]

39. Regarding ANT holders' other Treasury assets not set aside for the redemption—valuing *millions of dollars*—the Association and its officer announced that it would keep those funds for themselves in a blatant act of theft. These stolen funds would go towards two purposes. First, the Association would use $11 million dollars of stolen funds to capitalize the Aragon Shield Foundation ("Aragon Shield"), a new non-profit whose sole purpose would be to finance the legal defense of the Association and its officers.[49] Second, the Association would use the remaining funds stolen from the Treasury to finance "[a] company composed of the current Aragon OSx team that will continue product development" and be overseen by a Product Council in charge of receiving and allocating resources.[50] Upon information and belief, this new ***for-profit*** company is Aragon X AG ("Aragon X").[51]

40. Adding insult to injury, the Association and its officers announced that their theft would also extend to any portion of the funds set-aside for the redemption which remained unclaimed by ANT holders after the Association's own imposed November 2nd deadline.[52] This particular act of theft will occur automatically following the end of the Redemption Period given

---

[47] ANT Token Redemption Initiative, *Terms and Conditions* (last updated Oct. 12, 2023).
[48] Aragon, *A New Chapter for the Aragon Project* (Nov. 2, 2023).
[49] Aragon, *A New Chapter for the Aragon Project* (Nov. 2, 2023).
[50] Aragon, *A New Chapter for the Aragon Project* (Nov. 2, 2023).
[51] Aragon, *Terms and Conditions*, ARAGON.ORG, https://aragon.org/terms-and-conditions (last visited Oct. 30, 2024).
[52] Aragon, *A New Chapter for the Aragon Project* (Nov. 2, 2023).

the self-executing nature of smart contracts.[53] There is likely to be a significant amount of unredeemed ANT, reflecting ANT residing in abandoned digital wallets or by those ANT holders who did not utilize the Redemption Smart Contract. These unclaimed funds, also rightfully belonging to ANT holders and not the Association, will potentially amount to *millions of dollars*.

41. With the Association's proverbial gun at its head, Patagon faced a difficult decision: either use the Redemption Smart Contract to recoup ***some*** of its property wrongfully withheld by Aragon at the price of its ANT or let the deadline pass by and watch Aragon steal ***all*** Patagon's property in the Treasury. Seeking to minimize its losses, Patagon used the Redemption Smart Contract to recoup a portion of its property by selling the majority of the ANT it still possessed on November 16, 2023, though at the time of filing this Complaint, Patagon still owns more than 100,000 ANT. Aragon continues to wrongfully withhold the remainder of Patagon's (and all ANT holders') Treasury assets and has said the ANT it coerced from Patagon and the other redeeming ANT holders will be destroyed after Aragon's deadline by the Redemption Smart Contract.

**F. Patagon demands that the Association return its property, which the Association refuses, followed by its officers proceeding to destroy incriminating documents.**

42. After several months and numerous conversations between Patagon's owner and Luis Cuende over Telegram, Patagon's counsel sent a formal demand letter to the Association and its officers on September 17, 2024. That same day, Patagon's owner received notice that Cuende had changed his Telegram setting to "Delete After 30 Days," meaning that Cuende's new messages with Patagon's owner would be deleted after 30 days on a going forward basis

[53] Investopedia, *What Are Smart Contracts on the Blockchain and How Do They Work?*, available at https://www.investopedia.com/terms/s/smart-contracts.asp#:%7E:text=A%20smart%20contract%20is%20a,transactions%20are%20trackable%20and%20irreversible ("A smart contract is a self-executing program that automates the actions required in a blockchain transaction. Once completed, the transactions are trackable and irreversible.").

(previously, it had been set to retain messages). Later that same day, Cuende's messages related to his discussions with Patagon's owner on ANT and the Association began disappearing as Cuende apparently began directly deleting messages related to these issues.

43. On September 25, 2024, Michael Frisch, an attorney for the Aragon Shield Foundation responded to the Demand Letter, but did not substantively address Patagon's demands. On October 7, 2024, Patagon's counsel sent another demand letter to Attorney Frisch. On October 11, 2024, Attorney Frisch clarified that he represents the Aragon Association and Aragon Shield Foundation, but again did not substantively respond to Patagon's demands. As such, any attempts made by Patagon or its counsel to work with the Defendants to achieve an acceptable resolution have been unsuccessful, and those unfruitful negotiations have eaten away at the remaining time prior to the end of the Redemption Period, which is now less than 72 hours away.

**G. The Association's theft of the DAO's funds is just the latest step in a pattern of self-dealing, conflicts of interest, and lack of transparency by the Association and its officers.**

44. The final decision by the Association and its officers to abscond with ANT holders' funds and dissolve the DAO is the culmination of a broader pattern of unearthed wrongful behavior by the Association and its officers to use the DAO and the DAO's funds in the Treasury to enrich themselves and pursue their personal commercial interests. Despite their initial promises to responsibly and transparently act as a custodian of ANT holders' funds, it has now become clear that Cuende and other Association officers planned all along to use the Association's guise as the DAO's non-profit "steward" to hoodwink ANT holders, enabling them to raise and store funds until they could use their position of trust and control to architect a DAO that they—not ANT holders—would control. Then, once the DAO was up and running, the Association could

complete its transformation into a "stateless" for-profit entity under the control of the Association's officers.

45. In one particularly egregious example of the self-dealing carried out by the Association's officers, in March 2023, Cuende used his position of trust with and control over the DAO to effectuate a transfer of Treasury assets worth more than a million dollars to one of his other ventures, Nation3, which at the time was struggling and in need of funds.[54] Under the terms of the transfer, ANT holders would receive 2,000 NATION, Nation3's governance token, in exchange for 1 million USDC (a stablecoin pegged to the value of the U.S. dollar) and 300,000 ANT (at that time worth approximately $700,000).[55]

46. This is but one example of how the Association and its officers utterly failed to live up to their duties as stewards of the DAO and ANT holders' funds, instead taking advantage of the trust placed in them by ANT holders to further their own selfish interests, all the while responding to ANT holders' pleas for transparency with lies and deception. The Association and its officers must be held accountable for their misdeeds and prevented from running off with the millions of dollars of property which rightfully belong to ANT holders.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract
### (as to Defendants Aragon Association and Luis Cuende)

47. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

---

[54] Aragon, *Aragon and Nation3 Partner to Advance Human Coordination*, ARAGON BLOG (Mar. 23, 2023), https://blog.aragon.org/aragon-and-nation3-swap-tokens/

[55] Aragon, *Aragon and Nation3 Partner to Advance Human Coordination* (Mar. 23, 2023).

48. Defendants offered ANT in a public sale in exchange for Ether. They promised that the purchase of ANT would afford ANT holders the right to ownership of 70% of funds raised in the ANT sale as well as membership and voting rights in the DAO. These rights were freely assignable through the sale of ANT on secondary markets, consistent with the ethos of the Aragon Manifesto and public statements made by Defendants. Defendants also agreed to act as the legal steward for ANT holders' funds, providing transparent custody and management services until the DAO was able to take direct custody of its assets.

49. ANT holders accepted this offer through the purchase of ANT with Ether, thus creating a contract between Defendants and ANT holders.

50. Plaintiff, through its purchase of ANT on a secondary market, became an ANT holder and was thereby assigned the rights afforded to all ANT holders, including the right of ownership in its share of Treasury funds and voting rights in the DAO proportionate with its ownership.

51. Defendants breached their contract with ANT holders when they refused to transfer the Treasury funds to the DAO following ANT holders' vote in June 2022.

52. Defendants further breached their contract with ANT holders when they unilaterally decided to abscond with millions of dollars of assets in the Treasury to fund Aragon Shield as well as their other ventures.

53. Defendants further breached their contract with ANT holders through their coercive "offer" to force ANT holders, including Plaintiff, to accept a partial redemption for their ANT or else watch as Defendants rendered that ANT worthless through their own actions.

54. Defendants further breached their contract with ANT holders by failing to offer transparency in their management of the Treasury, such as in their actions surrounding the

decision to send more than a million dollars of assets from the Treasury to Nation3, a completely unrelated company also founded by Cuende.

55. These breaches caused ANT holders, including Plaintiff, damages in the form of the funds wrongfully taken from the Treasury as well as a reduction in the value of the ANT that Plaintiff and other ANT holders continue to hold or already redeemed in the face of the Association's threats.

**COUNT II**
**Breach of Fiduciary Duty**
**(as to Defendants Aragon Association and Luis Cuende)**

56. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

57. Defendants enticed people to purchase ANT with public promises that they would act as stewards for ANT holders' funds in the Treasury. In that role, Defendants took custody of the Treasury and managed the distribution and investment of funds therein. Defendants marketed themselves as possessing special expertise in decentralized governance and blockchain ecosystems that would make them suited to the role of *de facto* trustee of the Treasury. Relying on Defendants' promises, ANT holders put their trust in Defendants to manage their assets until the DAO requested the funds be returned to them. This relationship of trust placed fiduciary duties on Defendants to exercise care in managing the Treasury, to remain loyal to ANT holders in their decisions to invest and disburse the funds, and to act in good faith in providing transparent updates to ANT holders on the status of their funds.

58. Defendants breached their fiduciary duty of loyalty in failing to honor the DAO's request to give it control of the Treasury following the DAO's vote in June 2022.

59. Defendants breached their fiduciary duty of loyalty by failing to offer full redemption of ANT and absconding with Treasury assets worth millions of dollars.

60. Defendants breached their fiduciary duty of loyalty by exploiting their influence over the DAO to effectuate a transfer worth more than a million dollars from the Treasury to Nation3, an unrelated venture co-founded by Cuende, in a blatant act of self-dealing.

61. Defendants breached their fiduciary duty of care by failing to act with transparency regarding Treasury funds following requests for information from ANT holders.

62. Defendants' breaches have caused damages to ANT holders, including Plaintiff, by decreasing the value of Plaintiff's ownership right in the Treasury and causing damage to the value of the ANT Plaintiff either continues to hold or was coerced into redeeming.

**COUNT III**
**Conversion**
**(as to all Defendants)**

63. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

64. Plaintiff is a part owner of the Treasury as an ANT holder. Plaintiff and other ANT holders requested the return of their funds from the Defendants and had a right to possession of their funds.

65. Defendants intentionally refused to return the Treasury to the ANT holders, including Plaintiff, and instead absconded with or intends to abscond with DAO assets to the tune of millions of dollars.

66. Defendants thus interfered with Plaintiff's and other ANT holders' property rights in the Treasury funds and their ANT to the exclusion of Plaintiff's and other ANT holders' rights, and Defendants continues to exercise wrongful dominion and control over the Treasury funds.

**COUNT IV**
**Unjust Enrichment**
**(as to all Defendants)**

67. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

68. Through their wrongful retention and taking of Plaintiff's property, Defendants have been enriched at Plaintiff's expense such that it would be against equity and good conscience to permit Defendants to retain the money that Plaintiff is owed.

69. Upon information and belief, Defendants have benefited from withholding Plaintiff's funds in the Treasury by either keeping that money for themselves or using the money to further development of their other projects with no benefit to Plaintiff and for Defendants' personal gain.

70. It is against equity and good conscience to permit Defendants to retain the funds that Plaintiff is owed due to Defendants' own conduct through either breach of contract (described in Count I above) and/or by performing other illegal or inequitable actions to damage Plaintiff. Defendants have chosen not to honor the promises they made related to ownership of the Treasury and governance of the DAO by ANT holders and have instead refused to allow ANT holders to redeem their rightfully-owned tokens for the full amount of the Treasury or otherwise take control of their funds.

71. As a direct and proximate result of Defendants' wrongful retention of Plaintiff's funds, including its Treasury funds and the ANT it was coerced into redeeming, Defendants have been unjustly enriched at Plaintiff's expense.

**COUNT V**
**Money Had and Received**
**(as to Defendants Aragon Association, Aragon Shield, and Aragon X)**

72. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

73. Defendants came into possession of money belonging to Plaintiff when Plaintiff purchased ANT and thus acquired an ownership right in the Treasury managed by Defendants. Plaintiff purchased this ANT with the expectation of profit and the understanding that Defendants would return the Treasury to the DAO as promised.

74. Upon information and belief, Defendants have benefited from withholding Plaintiff's funds by using the money to (i) fund Aragon Shield (and therefore their own legal costs and liabilities) and (ii) further development of other projects, including upon information and belief Aragon X, with no benefit to Plaintiff and for Defendants' personal gain, or has otherwise withheld the funds from Plaintiff.

75. Plaintiff and other ANT holders have voted to have Defendants return the money to the DAO, such right afforded to them by ANT holders' governance rights described in the initial sale of ANT; however, Defendants have unilaterally refused to allow Plaintiff to fully redeem their tokens for the Treasury. Thus, under principles of equity and good conscience, Defendants should be required to honor their initial promises and should not be permitted to unjustly withhold Plaintiff's funds.

**COUNT VI**
**Imposition of Constructive Trust**
**(as to Defendants Aragon Association, Aragon Shield, and Aragon X)**

76. Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

77. Plaintiff requests this Court to impose a constructive trust upon the property taken from the Treasury that is currently held by Aragon Shield and/or Aragon X, and further calls for the restoration to the Treasury of that wrongfully obtained property.

78. As set forth above, Defendants, through various wrongs, obtained and held the Treasury, which in equity and good conscience, they should not be permitted to hold.

79. By way of the actions described herein, Defendants caused certain funds to be sent from the Treasury to Aragon Shield that should not have been sent.

80. By way of the actions described herein, Defendants caused certain funds to be sent from the Treasury to Aragon X that should not have been sent.

81. Plaintiff and Defendants are in a confidential or fiduciary relationship, as Defendants were entrusted with Plaintiff's assets as a temporary custodian and manager of the Treasury funds owned by the DAO.

82. As a result, Aragon Shield and Aragon X have each been unjustly enriched and hold funds that belong to Plaintiff.

83. Any and all of Plaintiff's assets being held by Aragon Shield and/or Aragon X must be held in trust for Plaintiff's benefit without being used by either entity until further order of this Court.

84. Likewise, the remaining funds of the Treasury should be held in trust for the benefit of Plaintiff and other ANT holders without being used by these entities until further order of this Court.

85. The cryptocurrency assets at issue are specific, identifiable property and can be traced to certain blockchain-based addresses. Upon information and belief, the other Treasury assets at issue here are specific, identifiable property held in Defendants' bank accounts.

**COUNT VII**
**Equitable Accounting**
**(as to Defendant Aragon Association)**

86. Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

87. Plaintiff and Defendant Aragon Association are in a confidential or fiduciary relationship, as Plaintiff entrusted Defendant with its funds, and the Defendant has refused to give control over the Treasury to the DAO following the DAO's June 2022 vote.

88. Plaintiff purchased ANT in reliance on the fact that ANT holders would govern the DAO and would own and later directly control the Treasury as a decentralized autonomous organization.

89. But Defendant reneged, wrongfully kept its control of the Treasury, and along the way allowed funds to go out for items that were either not approved by the DAO or were approved under a conflict of interest.

90. Plaintiff seeks transparency and an equitable accounting to ensure that no other funds have been taken from the Treasury except for those approved by an unbiased majority of ANT holders.

**PRAYER FOR RELIEF**

91. WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against Defendants, awarding Plaintiff compensatory damages in an amount to be determined at trial and any other relief the Court deems just and proper.

**JURY DEMAND**

92. Plaintiff demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

Dated: New York, New York.
October 31, 2024

Respectfully submitted,

**PERKINS COIE LLP**

By: */s/ Emily B. Cooper*

Emily B. Cooper
Stephen M Hogan-Mitchell*
**PERKINS COIE LLP**
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036-2711
Tel: (212) 262-6900
Fax: (212) 977-1649
ECooper@perkinscoie.com

**Application for SDNY admission forthcoming*

John R. Hardin*
**PERKINS COIE LLP**
500 N. Akard Street, Suite 3300
Dallas, TX 75201-3347
Tel: (214) 965-7700
Fax: (214) 965-7799
JohnHardin@perkinscoie.com

**Pro hac vice application forthcoming*

*Attorneys for Plaintiff Patagon Management LLC*