UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATAGON MANAGEMENT LLC,<br>*Plaintiff*,<br><br>vs.<br><br>THE ARAGON ASSOCIATION, THE ARAGON SHIELD FOUNDATION, ARAGON X AG, and LUIS CUENDE,<br>*Defendants*. | Case No. ________________________ |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF EX PARTE APPLICATION BY ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND ORDER GRANTING ALTERNATIVE SERVICE**

# TABLE OF CONTENTS


Page

I. INTRODUCTION ... 1

II. RELEVANT FACTS ... 1

A. The Association misleads investors by promoting itself as a transparent organization that promotes self-governing DAOs. ... 2

B. The Association raises approximately $25 million in funds by selling ANT, with the majority of those funds belonging to the DAO ... 3

C. Plaintiff purchases ANT in June 2023 ... 4

D. The Association refuses to transfer control of the DAO Treasury ... 4

E. The Association dissolves the DAO and absconds with Treasury funds ... 5

F. Plaintiff mitigates its damages by redeeming a portion of its ANT holdings ... 7

G. It will likely be impossible to recover the Treasury assets when the Redemption Period closes ... 7

III. ARGUMENT ... 8

A. Plaintiff meets the requirements for a Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction ... 8

1. Plaintiff will suffer irreparable harm absent relief ... 9

2. This Court has authority to freeze the Treasury assets. ... 11

3. Plaintiff is likely to succeed on the merits. ... 14

B. Balance of equities favors issuing a Temporary Restraining Order ... 22

C. Public interest favors issuing a Temporary Restraining Order. ... 23

D. Fed. R. Civ. P. 65 permits this Court to enter a Temporary Restraining Order Ex Parte. ... 23

E. This Court should permit Plaintiff to serve Defendants by alternative means. ... 24

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*,
96 F. Supp. 3d 182 (S.D.N.Y. 2015) ........ 16, 17

*3M Co. v. Performance Supply, LLC*,
458 F. Supp. 3d 181 (S.D.N.Y. 2020) ........ 8

*725 Eatery Corp. v. City of New York*,
408 F. Supp. 3d 424 (S.D.N.Y. 2019) ........ 8, 14

*AIM Int'l Trading, LLC v. Valcucine, SpA.*,
188 F. Supp. 2d 384 (S.D.N.Y. 2002) ........ 8

*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*,
No. 18-cv-2897, 2018 WL 2022626 (S.D.N.Y. Apr. 30, 2018) ........ 12

*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*,
No. 18-cv-2897, 2018 WL 5118638 (S.D.N.Y. Oct. 22, 2018) ........ 12, 13

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010) ........ 16, 17

*Astrove v. Doe*,
No. 22-cv-80614, 2022 WL 2805345 (S.D. Fla. June 17, 2022) ........ 10

*Citigroup Glob. Mkts, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010) ........ 8

*Colavito v. New York Organ Donor Network, Inc.*,
8 N.Y.3d 43 (2006) ........ 18

*Dubai Islamic Bank v. Citibank, N.A.*,
126 F. Supp. 2d 659 (S.D.N.Y. 2000) ........ 19

*F.T.C. v. PCCare247 Inc.*,
No. 12-cv-7189, 2013 WL 841037 (S.D.N.Y. Mar. 7, 2013) ........ 25

*Firemen's Ins. Co. of Newark, New Jersey v. Keating*,
753 F. Supp. 1146 (S.D.N.Y. 1990) ........ 9

*Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.*,
333 F. Supp. 3d 307 (S.D.N.Y. 2018) ........ 21

*Gaponyuk v. Alferov*,
No. 23-cv-01317, 2023 WL 4670043 (E.D. Cal. July 20, 2023)....................................9, 10

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999)...........................................................................................11

*Heissenberg v. Doe*,
No. 21-cv-80716, 2021 WL 8154531 (S.D. Fla. Apr. 23, 2021)..........................................9

*In re: Dreier LLP*,
544 B.R. 760 (Bankr. S.D.N.Y. 2016)....................................................................20

*In re Stralem*,
303 A.D.2d 120 (2d Dep't 2003)............................................................................14

*In re StyleSite Marketing, Inc.*,
253 B.R. 503 (Bankr. S.D.N.Y. 2000)....................................................................21

*In re Vuitton et Fils S.A.*,
606 F.2d 1 (2d Cir. 1979) (per curiam)........................................................23, 24

*Jacobo v. Doe*,
No. 22-cv-00672, 2022 WL 2052637 (E.D. Cal. June 7, 2022)....................................9, 10

*Johnson v. Nextel Commc'ns, Inc.*,
660 F.3d 131 (2d Cir. 2011)..................................................................................16

*Kern v. Robert Currie Assocs.*,
220 A.D.2d 255 (1st Dep't 1995)...........................................................................16

*Lagemann v. Spence*,
No. 18-cv-12218, 2019 WL 4014846 (S.D.N.Y. Jan. 24, 2019)....................................9, 23

*Marshall v. United States*,
831 F. Supp. 988 (E.D.N.Y. 1993)..........................................................................17

*Mason Tenders Dist. Council Pension Fund v. Messera*,
No. 95-cv-9341, 1997 WL 223077 (S.D.N.Y. May 1, 1997), *aff'd sub nom., Mason Tenders Dist. Council Pension Fund v. Pervale Contracting Inc.*, 131 F.3d 131 (2d Cir. 1997)..........................................................................11, 12

*Noble Sec., Inc. v. Ingamar Co.*,
No. 21-cv-1372, 2021 WL 2012508 (E.D.N.Y. May 20, 2021)........................................25

*Parsons & Whittemore Enters. Corp. v. Schwartz*,
387 F. Supp. 2d 368 (S.D.N.Y. 2005) ........................ 20

*Precise-Mktg. Corp. v. Simpson Paper Co.*,
No. 95-cv-5629, 1996 WL 285364 (S.D.N.Y. May 30, 1996) ........................ 14

*Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020) ........................ 9

*Republic of Philippines v. Marcos*,
806 F.2d 344 (2d Cir. 1986) ........................ 11

*Rio Props., Inc. v. Rio Int'l Interlink*,
284 F.3d 1007 (9th Cir. 2002) ........................ 25

*United States v. Benitez*,
779 F.2d 135 (2d Cir. 1985) ........................ 20

*Wen v. NYC Reg'l Ctr., LLC*,
695 F. Supp. 3d 517 (S.D.N.Y. 2023), *aff'd*, No. 23-7506, 2024 WL 4180521 (2d Cir. Sept. 13, 2024) ........................ 17

*WPIX, Inc. v. ivi, Inc.*,
691 F.3d 275, 285 (2d Cir. 2012) ........................ 8

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 4 ........................ 24, 25

Federal Rule of Civil Procedure 65 ........................ 23, 24

## I. INTRODUCTION

Plaintiff Patagon Management LLC ("Plaintiff") submits this memorandum of law in support of its application for a temporary restraining order and Order to Show Cause for preliminary injunction to enjoin the Aragon Association (the "Association"), the Aragon Shield Foundation ("Aragon Shield"), Aragon X AG ("Aragon X"), and Luis Cuende ("Cuende") (collectively, "Defendants"), from taking any action to abscond with, transfer, remove, dissipate, or otherwise move assets currently held at smart contract address 0x80fBB6122b8E023988e640dB1ae348a10A7933E8 or from any other blockchain-based wallet that is under the control of the Defendants and contains assets associated with the decentralized autonomous organization ("DAO") composed of holders of the Aragon Network Token ("ANT") after November 2, 2024, at 23:59 UTC.

## II. RELEVANT FACTS

Defendants have taken assets valuing millions of dollars from ANT holders, and will take millions more after November 2, 2024, at 23:59 UTC via a self-executing smart contract created by Defendants.

When the Association and its founders, including Cuende, were raising funds through the initial sale of ANT tokens, they promised purchasers that they would allow holders of ANT to govern the DAO upon their purchase of ANT tokens by voting with their tokens ***and*** that the DAO would own and eventually directly control a portion of the funds raised in the initial ANT sale (the "Treasury"). But after enriching itself with millions of dollars via this sale, the Association reneged and ultimately unilaterally shut down the DAO while claiming millions in Treasury funds for itself and refusing to allow ANT holders to fully redeem the value of their ANT.

Instead, the Association limited ANT holders to only a partial redemption of their ANT by November 2, 2024 at 23:59 UTC (the "Redemption Period"), thereby creating a certain residual amount of Treasury assets that the Association intends to take. Complaint ("Compl.") ¶¶ 2-3. Further, it is common for some token-holders not to participate in any redemption by the deadline for a variety of reasons. And here, it is expected that tens of millions of dollars of assets will go unredeemed, which the Association again intends to scrape away for itself instead of returning to ANT holders. Compl. ¶ 3; Affidavit of Diogenes Casares ("Casares Aff.") ¶ 31. As detailed below, all of this is consistent with past actions as the Defendants have already diverted substantial Treasury funds for their own use.

Defendants held themselves out as stewards of the Treasury owned by ANT holders. The Association was to be a temporary custodian of the Treasury until the DAO took control, with ANT holders in turn controlling the DAO. Compl. ¶¶ 17, 24, 29. That is, until the value of the Treasury's assets ballooned to nearly 200 million dollars by June 2021. Casares Aff. ¶ 14. After the Treasury assets grew, the Association reneged on its promises and began using the funds for its own personal pet projects. All this was done with Treasury assets rightfully owned by ANT holders. Defendants' activities show that it will abscond with any assets remaining after the Redemption Period ends on November 2, 2024 at 12:59 UTC. As such, Plaintiff's funds are at risk of being lost forever. Plaintiff has no choice but to request that this Court act as soon as possible to enjoin Defendants from taking any action to abscond with any assets remaining in the Treasury following the Redemption Period.

## A. The Association misleads investors by promoting itself as a transparent organization that promotes self-governing DAOs.

The Association promoted itself as the steward of the "Aragon project," which it describes as a project to manage certain funds, including funds raised in the ANT sale. Casares Aff. ¶ 12.

The Association was founded by Cuende as well as Jorge Izquierdo in 2016 and has consistently held itself out as a "transparent" organization focused on allowing ANT holders to govern the DAO. *Id.* ¶¶ 12, 23. As such, the Association represented itself as allowing ANT holders to make governance decisions about the trajectory of the DAO in a typical blockchain-based voting system. *Id.* ¶ 6.

The Association laid out its purported principles in a 2018 "Aragon Manifesto." Compl. ¶ 20. In the Aragon Manifesto, the Association emphasized that the DAO would allow token holders to self-govern, stating "Decentralized organizations change our relationship with governance: from something that is imposed upon us by others, into something we choose to opt into . . . we can, and must, engineer systems to empower the people's voice to their fullest potential." *Id.* (citing Aragon Manifesto).

### B. The Association raises approximately $25 million in funds by selling ANT, with the majority of those funds belonging to the DAO.

In 2017, the Association raised approximately $25 million in Ether (ETH) in an Initial Coin Offering ("ICO"), promising that 70% of these assets would comprise the Treasury belonging to ANT holders. Casares Aff. ¶ 9. To raise these funds, the Association sold ANT to investors, kept 30% of the funds for itself and its founders and early contributors to the project, and then took custody of ANT holders' funds in the Treasury. *Id.* ¶ 11; Compl. ¶ 21. The Association represented that, by purchasing ANT, a purchaser would gain governance rights in the DAO, including with respect to how their investment would be used. Casares Aff. ¶¶ 10-11. In addition to ownership rights in the Treasury, the Association represented that ANT holders could purchase ANT with the expectation of profit due to the increased value of ANT over time as the Aragon Network expanded. Compl. ¶ 23. Accordingly, since the initial sale of ANT, market participants acquired ANT with the understanding and expectation that the ANT could increase in value over time as

the DAO grew and conferred on them (i) governance rights in the DAO that would eventually directly control the Treasury, and (ii) ownership rights in the Treasury so that they would benefit from any increase in the value of the Treasury's assets. Casares Aff. ¶ 11.

The Association and its founders also represented that the rights afforded to ANT holders were freely transferrable and assignable through secondary sales of ANT, which would allow membership in the DAO to evolve over time and incentivize ANT purchasers through the prospect of selling their ANT at a profit. Casares Aff. ¶ 13.

**C. Plaintiff purchases ANT in June 2023.**

On June 16, 2023, while Plaintiff was in New York, Plaintiff purchased 767,263.4271 ANT on a secondary market, with the expectation and intention of using it to participate in DAO governance while also benefitting from any potential increase in ANT's value and the Association's continued promises to transfer control of the Treasury to the DAO. Casares Aff. ¶ 27. Further, prior to the purchase, Cuende reassured Plaintiff's Chief Executive Officer that the Treasury funds would be transferred to the DAO.[1]

**D. The Association refuses to transfer control of the DAO Treasury.**

By June 2021, the Treasury's assets had increased to nearly $200 million. *Id.* ¶ 14.

In June 2022, ANT holders voted to transfer control of the Treasury to the DAO, as the Association and Cuende had promised to do since the ICO. *Id.* ¶ 15. Though the Association acknowledged this vote, they refused to honor the vote. *Id.* Instead, the Association announced a "soft deadline" for relinquishing control of the Treasury funds of November 30, 2022. *Id.* ¶¶ 15-16.

[1] Cuende did so through Telegram messages that he intentionally deleted the day that he received Plaintiff's initial demand letter. Casares Aff. ¶ 41.

The November 30, 2022 deadline passed without the return of the Treasury funds to ANT holders. *Id.* ¶ 17. At that point, the Association announced another "new governance approach," whereby the Association would "gradually" move the treasury funds to the DAO. *Id.* This "new governance approach" was neither proposed to nor voted on by ANT holders. *Id.* ¶ 18.

By May 2023, the Association still showed no intention of transferring the Treasury funds to the DAO, instead stating that it would "only continue transferring funds to the Aragon Network DAO if it has reasonable assurance the funds will go into the hands of builders advancing its mission, as per its mandate." *Id.* ¶ 25. In other words, despite the lofty rhetoric contained in the Aragon Manifesto and the very nature of DAOs, the Association sought to control and direct the funds to projects it wanted and it preferred instead of allowing ANT holders to control the DAO and the Treasury as it had promised during the ICO.

### E. The Association dissolves the DAO and absconds with Treasury funds.

The Association's desire to control the DAO and its Treasury culminated in November 2023 when, after months of inaction, the Association announced that it would dissolve both itself and the DAO. *Id.* ¶ 30.

In its announcement, the Association explained that it would hold a redemption to allow ANT holders to redeem ANT for ETH currently held in the Treasury. *Id.* ¶ 31. However, rather than returning all the DAO's assets *pro rata* to its investors (ANT holders) via the redemption, the Association unilaterally decided to give ANT holders only a *portion* of their interest in the Treasury and to keep the rest for itself. *Id.* ¶ 31.

*First*, the Association announced that Aragon Shield would keep $11 million worth of Treasury assets "to cover outstanding obligations after the AA's dissolution and mitigate against

regulatory uncertainty." *Id.* ¶ 32. However, the Association never explained what obligations or uncertainty required them to retain those funds. *Id.*

*Second*, the Association announced they would divert Treasury funds to fund "[a] company composed of the current Aragon OSx team that will continue product development" and be overseen by a Product Council in charge of receiving and allocating resources," which is believed to be Aragon X. *Id.* ¶ 33. This diversion of funds would also include any remaining unclaimed funds from the Treasury set aside for redemption after the Redemption Period ended. *Id.*

Due to these two carveouts, the Association was only permitting ANT holders to redeem their ANT for a portion of the Treasury assets despite the fact that, upon purchasing ANT, ANT holders were promised they would collectively own the entire Treasury. *Id.* ¶ 34.

The redemption period will end on November 2, 2024, at 23:59 UTC. *Id.* ¶ 35. At that point, ANT will no longer be supported by the Association, and any remaining ANT will be destroyed. *Id.*

Based on publicly available information, the Treasury assets subject to the redemption are located at blockchain address 0x80fBB6122b8E023988e640dB1ae348a10A7933E8 (the "Redemption Smart Contract"). *Id.* ¶ 46. This is a self-executing smart contract that will distribute the funds automatically at 11:59 pm UTC on November 2, 2024, meaning that the Defendants have already put into motion the immediate dissipation of the assets away from the Treasury at that time. *Id.* ¶ 50; Compl. ¶¶ 38-40, n.53. This request is about freezing the assets in whatever blockchain wallet(s) the Defendants have unilaterally and secretly chosen as the landing spot for the assets.

**F. Plaintiff mitigates its damages by redeeming a portion of its ANT holdings.**

Plaintiff used the Redemption Period to recoup a portion of its rightful property, despite Defendants' unlawful acts in dissolving the DAO while ignoring ANT holders' governance rights. Casares Aff. ¶ 37. Plaintiff redeemed 272,286.827014788 ANT on November 16, 2023, but continues to hold 105,946 ANT, with the remaining value of Plaintiff's initial ANT purchase having been sold elsewhere.[2] *Id.* ¶ 38. Plaintiff's redeemed ANT and currently held ANT together reflect an approximately 0.87% ownership interest in the DAO and Treasury. *Id.* ¶ 38. Plaintiff was forced to redeem a portion of its holdings because once the Redemption Period closes, it will be impossible for ANT holders to claim their funds in the Treasury, and Defendants will be unlawfully enriched by any unclaimed funds, in addition to the other Treasury assets they've already unilaterally set aside for themselves, including the $11 million used to capitalize Aragon Shield. *Id.* ¶ 39.

**G. It will likely be impossible to recover the Treasury assets when the Redemption Period closes.**

Once the Redemption Period closes, ANT holders will no longer be able to access the Treasury funds. *Id.* ¶¶ 46-47. Further, Defendants have confirmed that they will take control of the Treasury assets identified in the Redemption Smart Contract after the Redemption Period ends. *Id.* ¶ 50. Once Defendants have control of the assets, they could move the funds and the potential to recover them is substantially reduced—especially as Defendants have already demonstrated their willingness to misappropriate DAO funds. *Id.*; Compl. ¶¶ 38-40; 44-46. Finally, Treasury assets could be lost via a number of scenarios outside of ANT holders' control. Casares Aff. ¶ 49. In that event, the DAO's assets may become ***permanently inaccessible to anyone***. *Id.* As such, Plaintiff

[2] Plaintiff reserves the right to redeem additional ANT.

is forced to resort to legal action, to ask this Court to restrain Defendants from moving any Treasury assets after the Redemption Period ends during the pendency of this request for relief.

## III. ARGUMENT

The Court should enter Plaintiff's proposed temporary restraining order and Order to Show Cause for preliminary injunction to prevent Defendants from absconding with, transferring, removing, dissipating, or otherwise moving assets currently held at the Redemption Smart Contract or from any other blockchain-based wallet that contains assets associated with the DAO, after the Redemption Period ends on November 2, 2024.

### A. Plaintiff meets the requirements for a Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction.

The applicable standard for issuance of a temporary restraining order is identical to the standard governing the issuance of a preliminary injunction. *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020). A plaintiff must show that (1) it "is likely to suffer irreparable harm in the absence of" relief, (2) it is "likely to succeed on the merits" (or at least raises "sufficiently serious questions"), (3) the "balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Citigroup Glob. Mkts, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34–35 (2d Cir. 2010); *see also AIM Int'l Trading, LLC v. Valcucine, SpA.*, 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002) (same).

"Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012). Plaintiff need only show a "likelihood of success on the merits of at least one of [its] claims," *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (citation omitted), or that there are sufficiently "serious question[s] going to the merits to make them a fair ground for trial," *Citigroup*, 598 F.3d at 34. A showing of "absolute certainty" is not required,

only "a showing that the probability of prevailing is better than fifty percent." *Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 41 (S.D.N.Y. 2020).

**1. Plaintiff will suffer irreparable harm absent relief.**

Plaintiff will undoubtedly suffer irreparable harm if this Court does not enter a temporary restraining order. Defendants' actions show that the Association is preparing to move, abscond with, or remove the Treasury funds and the funds already transferred to Aragon Shield, Aragon X, and Nation3.

"It is familiar law that where a non-movant's assets may be dissipated before final relief can be granted, or where the non-movant threatens to remove its assets from the court's jurisdiction, such that an award of monetary relief would be meaningless, injunctive relief is proper." *Firemen's Ins. Co. of Newark, New Jersey v. Keating*, 753 F. Supp. 1146, 1153 (S.D.N.Y. 1990) (collecting cases). And district courts across the country have applied this basic rule in the cryptocurrency context, agreeing that the risk of irreparable harm is "likely in matters concerning fraudulent transfers of cryptocurrency due to the risk of anonymous and speedy asset dissipation." *Jacobo v. Doe*, No. 22-cv-00672, 2022 WL 2052637, at *5 (E.D. Cal. June 7, 2022); *Gaponyuk v. Alferov*, No. 23-cv-01317, 2023 WL 4670043, at *3 (E.D. Cal. July 20, 2023) (granting request for temporary restraining order where plaintiff demonstrated risk that defendant may transfer assets to unknown locations); *see also Lagemann v. Spence*, No. 18-cv-12218, 2019 WL 4014846, at *2 (S.D.N.Y. Jan. 24, 2019) (granting request for temporary restraining order and barring defendant from transferring assets from any cryptocurrency wallet or cryptocurrency trading account); *Heissenberg v. Doe*, No. 21-cv-80716, 2021 WL 8154531, at *2 (S.D. Fla. Apr. 23, 2021) (finding irreparable harm to be likely if a temporary restraining order were not granted due to the "speed and potential anonymity of cryptocurrency transactions"). As such, a temporary restraining order is appropriate to prevent the immediate and irreparable harm likely to be caused

when the asset at issue involves cryptocurrency. *Jacobo*, 2022 WL 2052637, at *5 ("Because 'it would be a simple matter for [defendant] to transfer . . . cryptocurrency to unidentified recipients outside the traditional banking system' and effectively place the assets at issue in this matter beyond the reach of the court, the court finds that plaintiff is likely to suffer immediate and irreparable harm in the absence of injunctive relief.") (quoting *Fed. Trade Comm'n v. Dluca*, No. 18-cv-60379, 2018 WL 1830800, at *2 (S.D. Fla. Feb. 28, 2018)).

Plaintiff will suffer irreparable harm absent the relief sought. Without a temporary restraining order, Plaintiff is powerless to stop Defendants from continuing to engage in improper conduct aimed at frustrating any future judgment in this case. As set forth in the Casares Affidavit, after the Redemption Period ends, Defendants have stated that they will take control of the Treasury assets identified in the Redemption Smart Contract. Casares Aff. ¶ 50. Furthermore, and as evidenced in the above, Defendants have already demonstrated a willingness to abscond with Treasury funds through their transfers to Aragon Shield, Aragon X, and Nation3. *Id.*; Compl. ¶¶ 38-40. There is a significant risk that Defendants may dissipate these funds rightfully belonging to Plaintiff and other ANT holders or simply transfer those funds into untraceable cryptocurrency accounts. Casares Aff. ¶ 49-50. Because cryptocurrency transactions are instantaneous and anonymous, it is imperative to prevent Defendants from moving the assets from their current location to maintain the status quo and avoid dissipation of the digital assets wrongfully being held by Defendants. *See Astrove v. Doe*, No. 22-cv-80614, 2022 WL 2805345, at *4 (S.D. Fla. June 17, 2022) ("considering the speed with which cryptocurrency transactions are made, and the anonymity of those transactions, it is imperative to freeze the Assets Under Claim in the Destination Addresses to maintain the status quo and avoid dissipation of the money illegally taken from Plaintiff."); *Gaponyuk*, 2023 WL 4670043 at *3 (E.D. Cal. July 20, 2023) (granting TRO

where court determined that "there is significant risk the defendants will transfer his assets to 'untraceable cryptocurrency accounts or to offshore entities organized in unknown locations.'"). In addition, smart contracts like the ones being used by Defendants come along with inherent risks of total loss of assets in the event there is a failure or exploit in the smart contracts' code, which could potentially risk making the property at issue here ***permanently inaccessible to anyone*** if Defendants are not prevented from moving the Treasury funds. Casares Aff. ¶ 49. Furthermore, Cuende's attempts to destroy evidence demonstrate an intention by the Association's officers to transfer the assets out of the redemption contract, and otherwise avoid their duties to the DAO and ANT holders. Casares Aff. ¶ 41.

**2. This Court has authority to freeze the Treasury assets.**

Generally, federal courts lack the authority to freeze assets of the defendant before the claims have been brought to judgment. *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). However, where (as here) a plaintiff seeks equitable relief, the Court has authority to issue a preliminary injunction to freeze the assets in question—which are not rightfully Defendants' to possess. *See Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) (preventing transfer of property that would place them out of reach of judgment collection); *Mason Tenders Dist. Council Pension Fund v. Messera*, No. 95-cv-9341, 1997 WL 223077, at *4 (S.D.N.Y. May 1, 1997), *aff'd sub nom., Mason Tenders Dist. Council Pension Fund v. Pervale Contracting Inc.*, 131 F.3d 131 (2d Cir. 1997) ("[T]he United States Supreme Court and the Second Circuit have made Rule 65 available to secure assets for the ultimate judgment."). Courts in the Second Circuit have endorsed three different standards of "extraordinary circumstances" justifying the securing of assets pendente lite: "(1) that the defendant may be unable to satisfy a final monetary judgment; (2) that the final relief requested is equitable in nature; (3) that the frozen assets are related to the subject matter of the action." *Mason Tenders*, 1997 WL

223077, at *8. Here, Plaintiff's allegations meet all three standards: (1) cryptocurrency transactions can fail or be exploited, leading to a loss of funds, and if this happens to the Treasury funds, Defendants may be unable to use those funds to satisfy a money judgment; (2) Plaintiff requests equitable relief, namely imposition of a constructive trust and an accounting; and (3) the assets sought to be frozen are Plaintiff's and other ANT holders' property which is the subject matter of this action and currently being wrongly controlled by Defendants.

Neither should Defendants' identity as foreign individuals and entities caution against granting Plaintiff's requested relief here, as this Court has personal jurisdiction over all the Defendants.

To establish personal jurisdiction here, a court must first determine whether there is jurisdiction under New York's long-arm statute and second determine if the exercise of jurisdiction is consistent with the Due Process Clause. *Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, No. 18-cv-2897, 2018 WL 2022626, at *3 (S.D.N.Y. Apr. 30, 2018). That the Association sold ANT to customers in New York is alone sufficient to bring it within the purview of New York's long-arm statute. New York's long-arm statute "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction." *Id.* at *5. As described in the Complaint, the Association itself represented that at least two New York-based entities were ANT purchasers, with one such entity having been one of the six pre-sale investors. Compl. ¶ 12. As another Court in this District concluded, "by adducing evidence that a New York resident has purchased" the token at issue from the Association, Plaintiff "has demonstrated a reasonable probability that Defendants have transacted business in New York within the meaning of New York's long-arm statute." *Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, No. 18-cv-2897, 2018 WL 5118638, at *4 (S.D.N.Y. Oct. 22, 2018).

Exercising jurisdiction over the Association here also comports with the Due Process Clause. "Due process requires that a forum state's exercise of specific jurisdiction over a defendant must be limited to controversies arising out of or related to that defendant's forum-state activities, and that those activities reflect the defendant's purposeful availment of 'the privilege of conducting activities' within the state." *Id.* at *5 (internal citations omitted). Where, as here, the facts satisfying New York's long-arm statute—namely, the fact that the Association specifically marketed and sold ANT to at least one New York resident—establish that Plaintiff's claims "bear a relational nexus" to the Association's forum-state activities and show that those activities "constitute the purposeful transaction of business in New York," then "the constitutional requirements of personal jurisdiction are [likewise] satisfied." *Id.*

"[A] corporation's jurisdiction-conferring, in-state activities may be imputed to its officers where the officers exercise some control over those activities." *Id.* at *4, n.2 (cleaned up). Therefore, because the Court has personal jurisdiction over the Association, it also likewise has jurisdiction over the Association's officers, including Cuende who is both a co-founder of the Association and a member of its managing committee. Compl. ¶¶ 15, 19. In addition, where Aragon Shield and Aragon X are entities established by the Association and capitalized using funds stolen from ANT holders by the Association, those entities are sufficiently closely related to warrant a finding of personal jurisdiction. *See Alibaba Grp. Holding Ltd.*, 2018 WL 5118638, at *4 n.2 ("Defendants object to the treatment of all Defendants 'as a collective whole,' arguing that Alibaba must 'identify the specific way in which each individual Defendant acquired a nexus with New York that is sufficiently robust and intentional to warrant an exercise of jurisdiction.' At the preliminary-injunction stage, though, Alibaba need only demonstrate a reasonable probability of personal jurisdiction. Here, although Defendants point out that the corporate entities named as

defendants are not interchangeable, Alibaba has raised a reasonable probability that these commonly owned and managed entities, which are lumped together in Defendants' own marketing materials, operate jointly to facilitate the cryptocurrency sales that make personal jurisdiction appropriate here.") (internal citations omitted).

### 3. Plaintiff is likely to succeed on the merits.

To warrant injunctive relief, Plaintiff need only show a "likelihood of success on the merits of at least one of [its] claims," *725 Eatery Corp.*, 408 F. Supp. 3d at 459 (citation omitted). Here, Plaintiff is likely to succeed on each of its claims.

#### a. Breach of Contract[3].

"The elements for a breach of contract action are: (1) a contract; (2) performance of the contract by one party; (3) breach of the contract by one party; and (4) damages." *Precise-Mktg. Corp. v. Simpson Paper Co.*, No. 95-cv-5629, 1996 WL 285364, at *1 (S.D.N.Y. May 30, 1996). "[C]ontracts are freely assignable absent language which expressly prohibits assignment." *In re Stralem*, 303 A.D.2d 120, 122 (2d Dep't 2003) (internal citations omitted). "No particular words are necessary to effect an assignment…." *Id.* All that is needed is a transaction between the assignor and assignee intended to "vest in the assignee a present right in things assigned" and divest "all control over the thing assigned" from the assignor. *Id.* at 122–23 (internal quotation marks omitted). Thereafter, "the assignee steps into the assignor's shoes and acquires whatever rights the latter had." *Id.* at 123.

[3] The Association and Cuende will improperly contend that the parties' dispute is governed by various DAO-related agreements, including those described in the Complaint. Compl. ¶¶ 27–28, 33. However, these one-sided agreements do not apply to Plaintiff, and are simply evidence of Defendants' attempts to walk back their obligations to ANT holders *after* Defendants had already made promises to ANT holders in exchange for their purchase of ANT.

As established in the Complaint, the co-founders of the Association, including Cuende, individually and/or in their capacity as officers of the Association entered into a contract with ANT holders when those holders purchased ANT for Ether, and in exchange, they promised (i) to give ANT holders governance rights over the DAO, (ii) to grant ANT holders ownership rights to the Treasury, and (iii) to act as the custodian and manager of that Treasury until it could be managed directly by the DAO. These rights were freely assignable and were in fact assigned to Plaintiff when it purchased ANT on the secondary market. Casares Aff. ¶ 13. Thus, Plaintiff has stepped into the shoes of an original ANT purchaser and may enforce the contractual rights it now possesses.

Cuende and the Association breached their contractual obligations to ANT holders, including Plaintiff, in at least three ways. First, they breached their contractual obligations by refusing to transfer the Treasury funds to the DAO when ANT holders rightfully requested such transfer via their vote in June 2022. Second, Cuende and the Association breached their contractual obligations when they further refused to allow ANT holders to govern the DAO and failed to act as custodians of the Treasury by announcing that they were diverting millions of dollars of Treasury assets to fund Aragon Shield and Aragon X. Third, Cuende and the Association breached their contract with ANT holders by refusing to honor their ownership interest in the DAO by only offering a partial redemption for their ANT that expires November 2, 2024.

These breaches caused Plaintiff to suffer damages by, among other things, preventing Plaintiff from possessing the Treasury funds it rightfully owns as well as reducing the value of the ANT the Association coerced Plaintiff into redeeming for only part of the Treasury funds belonging to it.

As set forth above, Plaintiff has demonstrated that it is likely to succeed in establishing that an enforceable contract exists between Plaintiff and Defendants Cuende and the Association pursuant to which there has been an undisputed lack of performance by these Defendants that has left Plaintiff harmed.

**b. Breach of Fiduciary Duty.**

"The elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). "In addition to imposing contractual duties, a contractual relationship may give rise to fiduciary duties regardless of whether the contract itself includes specific words or language in that regard." *Kern v. Robert Currie Assocs.*, 220 A.D.2d 255, 255–56 (1st Dep't 1995); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 440 (S.D.N.Y. 2010) ("[A] fiduciary duty can arise from—but remain independent of—a contractual obligation."). "[A] fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 231 (S.D.N.Y. 2015) (citing *N. Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 101 (S.D.N.Y. 2013)). "'[T]he existence of a fiduciary duty arises ... when a party reposes trust or confidence in another who thereby gains a resulting superiority or influence over the first,' or 'when a party exercises de facto control or assumes responsibility for the affairs of another.'" *Id.* (citing *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 475 (S.D.N.Y. 2010)).

Here, Cuende and the Association's agreement to act as the "legal steward" of ANT holders—under which they took custody of and managed ANT holders' funds in the Treasury—created a fiduciary relationship between Cuende and the Association on the one hand and ANT

holders, including Plaintiff, on the other that was independent of these Defendants' contractual obligations. Casares Aff. ¶ 12. The Association's officers included the original creators of ANT, like Cuende, who enticed ANT holders into purchasing the token through their lofty promises to allow ANT holders to govern the DAO. Cuende promised that the Association would manage ANT holders' funds responsibly and transparently, as reflected in the statements on the Association's website stating it would keep those funds in "highly liquid assets that resonate with the vision of decentralization and DAOs" and release "Transparency Reports" bi-annually. Based on these representations, ANT holders placed their trust in the Association and its officers, including Mr. Cuende, as custodians and managers of the Treasury, and in this role they "exercise[d] de facto control" over ANT holders' property and "assume[d] responsibility for" ANT holders' affairs." *2002 Lawrence*, 96 F. Supp. 3d at 231. Courts have found that similar arrangements where one party acts as the custodian of the property of another supported a finding that a fiduciary duty existed between them. *See Anwar*, 728 F. Supp. 2d at 441 (plaintiffs alleged "sufficient facts to support an inference" that certain defendants owed plaintiffs a fiduciary duty where plaintiffs alleged such defendants held securities for plaintiffs, maintained records of those securities, and advertised that they were a "reliable fiduciary"); *Marshall v. United States*, 831 F. Supp. 988, 1006 (E.D.N.Y. 1993) (mother who acted as the custodian for her child's CD account "violated her fiduciary duty by not accounting for this money").

As ANT holders' fiduciaries, Cuende and the Association owed ANT holders a duty of care and duty of loyalty. *Wen v. NYC Reg'l Ctr., LLC*, 695 F. Supp. 3d 517, 545 (S.D.N.Y. 2023), *aff'd*, No. 23-7506, 2024 WL 4180521 (2d Cir. Sept. 13, 2024) ("fiduciary duty consists of several obligations, including the duty of care and duty of loyalty.") (cleaned up). The duty of care "dictates that a fiduciary, in the discharge of his responsibilities, must use at least that degree of

diligence that an 'ordinarily prudent' person under similar circumstances would use," while the duty of loyalty "imposes a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Id.* (cleaned up).

Cuende and the Association breached these duties in at least four ways. First, they breached their duty of loyalty in failing to honor the DAO's request to return the Treasury to its control following the DAO's vote in June 2022. Second, they breached their duty of loyalty by failing to offer full redemption of ANT and absconding with Treasury assets worth millions of dollars. Third, they breached their fiduciary duty of loyalty by exploiting their influence over the DAO to effectuate a transfer worth more than a million dollars from the Treasury to Nation3, an unrelated venture co-founded by Cuende. Fourth, they breached their fiduciary duty of care by failing to act with transparency regarding Treasury funds following requests for information from ANT holders.

These breaches caused Plaintiff and other ANT holders damages through the loss of Treasury funds rightfully belonging to them.

**c. Conversion.**

"A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession. Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49–50 (2006) (internal citations omitted).

Plaintiff and other ANT holders, under the contract formed by their purchase of ANT, gained a current ownership right in the Treasury and agreed to permit the Association, under the direction of Cuende, to temporarily take custody of and manage those funds as the "legal steward"

of the DAO. Following ANT holders' vote to return the Treasury to the DAO, the Association was divested of any authority it possessed to exercise control over the Treasury. Despite this, the Association has wrongly maintained control over the funds and/or diverted these funds to its own interests in a blatant act of theft, including through its diversion of Treasury funds to Aragon Shield, Aragon X, and Cuende's other venture, Nation3. As a result, Defendants are wrongfully exercising dominion over Plaintiff's property in derogation of its ownership rights.

**d. Unjust Enrichment.**

Plaintiff is likely to succeed on the merits of its claim for unjust enrichment because Defendants have accepted the direct benefits of the violations of Plaintiff's agreement with the Association and Cuende. To adequately plead a claim for unjust enrichment, the plaintiff must show that "(1) the defendant was enriched; (2) enrichment was at the plaintiff's expense; and (3) the defendant's retention of the benefit would be unjust.'" *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 669 (S.D.N.Y. 2000). Here, Plaintiff and other ANT holders exchanged Ether or other consideration for ANT tokens with the expectation that the Association, under the direction of Cuende and its other officers, would keep its promise to respect ANT holders' ownership rights in the Treasury and governance rights in the DAO. However, the Association failed to live up to this obligation (i) by transferring funds from the Treasury to Aragon Shield, Aragon X, and Nation3 without the approval of the DAO, and (ii) through offering only partial redemption for ANT tokens out of the remaining Treasury funds. Compl. ¶ 45. Defendants continue to refuse to return the funds transferred to Aragon Shield, Aragon X, and Nation3 or redeem the full amount of Treasury funds.

**e. Money Had and Received.**

"To maintain an action for money had and received, New York law requires the following elements: (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the

receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Parsons & Whittemore Enters. Corp. v. Schwartz*, 387 F. Supp. 2d 368, 377 (S.D.N.Y. 2005). As already evidenced, the Association obtained money belonging to Plaintiff when Plaintiff purchased ANT and thereby possessed an ownership interest in the Treasury, and Aragon Shield and Aragon X obtained money belonging to Plaintiff when the Association wrongfully transferred Treasury funds to them without the approval of ANT holders. Casares Aff. ¶ 33. Plaintiff purchased ANT expecting a profit and with the understanding that the Association would permit Plaintiff to redeem the tokens at a future date and be able to use the tokens for governance of the DAO. Instead, the Association, under the direction of its officers including Cuende, has transferred Treasury assets to its other commercial pursuits, such as Aragon Shield, Aragon X, and Nation3, thus benefitting from Plaintiff's money. Casares Aff. ¶ 33; Compl. ¶ 45. And despite repeated requests for their return, Defendants continue to withhold the funds they stole. Under principles of equity and good conscience, Defendants should not be permitted to keep these stolen funds.

**f. Imposition of a Constructive Trust.**

A constructive trust may be imposed when property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest. *In re: Dreier LLP*, 544 B.R. 760, 767 (Bankr. S.D.N.Y. 2016). Generally, the party seeking to impose a constructive trust under New York law must show: (i) a confidential or fiduciary relationship; (ii) a promise express or implied; (iii) a transfer of the subject was made in reliance on that promise; and (iv) unjust enrichment. *Id.* (internal citations and quotations omitted). In addition, the party asserting a constructive trust must be able to trace funds held in escrow to the specific property at issue. *United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985). Notwithstanding the stated requirements, the remedy is a flexible one and the facts need not satisfy

every element in all cases. *In re StyleSite Marketing, Inc.*, 253 B.R. 503, 508 (Bankr. S.D.N.Y. 2000).

As already stated above, Plaintiff purchased ANT tokens relying on promises made by the Association and Cuende that ANT holders would have voting rights in how the DAO was run and managed and would have ownership rights over assets in the Treasury. The Association and Cuende were fiduciaries of ANT holders because they promised the Association, under the guidance and direction of its officers including Cuende, would act as the "legal steward" of the DAO. The Association, Aragon Shield, and Aragon X have obtained and held Plaintiff's Treasury funds, which in equity and good conscience they should not be permitted to hold. Although Defendants have diverted some of those funds for personal use, the remaining unclaimed Ether set aside for the redemption is specific, identifiable property and can be traced to the following blockchain smart contract address on the Ethereum Network: 0x80fBB6122b8E023988e640dB1ae348a10A7933E8. Plaintiff, therefore, will more likely than not establish that a constructive trust should be imposed to make Plaintiff whole.

**g. Equitable Accounting.**

Plaintiff will also succeed on its request for an accounting of the Treasury. "Under New York law, there are four elements to a claim for equitable accounting: (1) a fiduciary relationship (2) entrustment of money or property (3) no other remedy and (4) a demand and refusal of an accounting." *Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.*, 333 F. Supp. 3d 307, 315 (S.D.N.Y. 2018) (internal citations and quotation marks omitted).

Plaintiff meets each element of a claim for equitable accounting. As set forth above, the Association and Cuende are in a fiduciary relationship with the Plaintiff in which Plaintiff entrusted the Association—under the direction and control of its officers including Cuende—with the custody and management of the assets Plaintiff owned which were held in the Treasury, thus

satisfying both the first and second prongs of a claim for equitable accounting. As previously noted, there is a significant risk that Defendants may dissipate the wrongfully held Treasury funds rightfully belonging to Plaintiff and other ANT holders or simply transfer those funds into untraceable cryptocurrency accounts. Casares Aff. ¶¶ 49-50. As such, Plaintiff has no adequate remedy at law, thereby satisfying the third prong of a claim for equitable accounting. Finally, Plaintiff and other ANT holders have demanded transparency for over a year now with respect to the use of funds being held in Treasury. Compl. ¶¶ 42-43. Plaintiff thereby satisfies the fourth and final prong of a claim for equitable accounting and is entitled to an accounting of the Treasury.

**B. Balance of equities favors issuing a Temporary Restraining Order.**

While Plaintiff would be severely prejudiced if Defendants dissipate the funds wrongfully withheld from Plaintiff, Defendants face no such prejudice. It is worth noting that the specific relief sought by Plaintiff with respect to the temporary restraining order identifies only <u>one</u> particular blockchain-based smart contract address which does not contain the personal property of Defendants. The funds in this address are not rightfully Defendants' to move absent direction of the governing holders of ANT. Thus, an order freezing those assets will, at worst, only slightly inconvenience Defendants by delaying Defendants' ability to move those funds to other cryptocurrency accounts, and at best, maintain the status quo for Plaintiff and potential other investors to recover their valuable assets. Furthermore, by requesting that the order only prevent the movement of unclaimed funds following the redemption deadline, Plaintiff ensures that its request for relief will not impact the rights of other ANT holders to mitigate their own damages by electing to use the Redemption Smart Contract. As shown above, Defendants face no harm from freezing the unclaimed Treasury assets tied up in the Redemption Smart Contract, while Plaintiff will face irreparable harm if Defendants abscond with those funds and move them to

untraceable cryptocurrency accounts or offshore entities in unknown locations. *See Lagemann*, 2019 WL 4014846, at *2.

### C. Public interest favors issuing a Temporary Restraining Order.

A temporary restraining order here would serve the public interest, including preventing the conversion of Plaintiff's assets, protecting against the risk that such funds will be illegally transferred.

In contrast, there is little public interest in not freezing the assets in question. While arguably there is an interest in not freezing assets unnecessarily, Plaintiff has shown that Defendants have no legal reason to move the unclaimed Treasury funds after the Redemption Period during the pendency of this dispute.

### D. Fed. R. Civ. P. 65 permits this Court to enter a Temporary Restraining Order Ex Parte.

Federal Rule of Civil Procedure 65(b) permits this Court to enter a temporary restraining order without notice to the adverse parties if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury . . . will result to the movant before the adverse party can be heard in opposition" and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." A temporary restraining order "may be ordered on an ex parte basis under subdivision (b) if the applicant makes a strong showing of the reasons why notice is likely to defeat effective relief." Fed. R. Civ. P. 65 Advisory Comm. Notes. As such, even where notice could have been given to the adverse party, ex parte orders are proper when notice "appears to serve only to render fruitless further prosecution of the action." *In re Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979) (per curiam). Here, while Plaintiff will attempt to notify Defendants of this application, this Court should grant Plaintiff's application before the adverse party can be heard in opposition to avoid Plaintiff suffering irreparable harm.

Plaintiff has met the requirements of Rule 65(b)(1). As summarized above and stated in more detail in the supporting Affidavit of Diogenes Casares, Plaintiff will suffer immediate and irreparable harm absent a temporary restraining order before the Redemption Period for ANT holders closes on November 2, 2024. Casares Aff. ¶ 39. After that date, it will be impossible for ANT holders to claim their funds from the Treasury. *Id.* Further, Defendants have stated that they will take control of the Treasury assets identified in the Redemption Smart Contract after the Redemption Period ends. *Id.* ¶ 50. Once Defendants have control of the assets, they could move the funds and the potential to recover them is substantially reduced—especially as Defendants have already demonstrated their willingness to misappropriate DAO funds. *Id.* Finally, it is possible that, at that point, the Treasury assets could be lost due to a hack or other adverse event. *Id.* ¶ 49. Because of this, advance notice of the next stage of this action is likely to "render fruitless further prosecution of this action . . . . [which is] precisely contrary to the normal and intended role of 'notice' . . . .", and ex parte relief is therefore warranted. *Matter of Vuitton et Fils S.A.*, 606 F.2d at 5.

As for the second prong, and as described in the Declaration of John Hardin, Plaintiff has attempted to contact Defendants prior to initiating this action through demand letters and will provide notice of this application promptly after filing at the electronic and physical addresses set forth in the Hardin Declaration. However, as set forth above, this Court should grant this application before the adverse party can be heard in opposition to avoid Plaintiff from suffering irreparable harm.

**E. This Court should permit Plaintiff to serve Defendants by alternative means.**

Plaintiff seeks to serve Defendants via alternative service under Federal Rule of Civil Procedure 4(f)(3). Investigation thus far reflects that the Association, Aragon Shield, and Aragon

X are Swiss entities while Cuende is a Spanish citizen currently residing in Portugal. Hardin Decl. ¶ 9. Plaintiff requests that the Court authorize Plaintiff to serve Defendants through as many of the following methods as are available: (1) mail, (2) email, and (3) online social media platforms associated with Defendants.

Federal Rule of Civil Procedure 4(f)(3) permits a court to authorize service through various methods, such as "publication, ordinary mail, mail to the defendant's last known address, delivery to the defendant's attorney, telex, and most recently, email." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002). Where alternative service is reasonably calculated to notify parties of legal action, it satisfies due process. *Noble Sec., Inc. v. Ingamar Co.*, No. 21-cv-1372, 2021 WL 2012508, at *6 (E.D.N.Y. May 20, 2021) (finding service via e-mail sufficient); *F.T.C. v. PCCare247 Inc.*, No. 12-cv-7189, 2013 WL 841037, at *5–6 (S.D.N.Y. Mar. 7, 2013) (finding that service via e-mail and Facebook satisfies due process requirements where (1) a high likelihood of defendants receiving and responding to e-mail sent to particular addresses and (2) notice via Facebook messages was supplemental means of service likely to provide notice to Defendants).

Plaintiff also has the contact information for the Association's and Aragon Shield's attorney, Michael Frisch. Hardin Decl. ¶ 11. While Mr. Frisch stated that he is not authorized to accept service for the Association and Aragon Shield, he did acknowledge Plaintiff's demand letters, and thus will receive notice of this application at the email address at which he received Plaintiff's demand letters. Hardin Decl. ¶ 10. Mr. Frisch also noted that he may represent Defendant Cuende, and thus will also be able to provide notice to Cuende. Hardin Decl. ¶ 7.

Plaintiff's proposed methods of service are reasonably calculated to provide actual notice and are appropriate in these circumstances. The Court should authorize Plaintiff's request for alternative service in accordance with the accompanying proposed order.

Dated: October 31, 2024

Respectfully submitted,

By: */s/ Emily B. Cooper*
Emily B. Cooper
Stephen M Hogan-Mitchell*
**PERKINS COIE LLP**
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036-2711
Tel: (212) 262-6900
Fax: (212) 977-1649
ECooper@perkinscoie.com

**Application for SDNY admission forthcoming*

John R. Hardin*
**PERKINS COIE LLP**
500 N. Akard Street, Suite 3300
Dallas, TX 75201-3347
Tel: (214) 965-7700
Fax: (214) 965-7799
JohnHardin@perkinscoie.com

**Pro hac vice application forthcoming*

*Attorneys for Plaintiff Patagon Management LLC*